# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. CHRISTOPHER RICHARD FALLS, Defendant. | No. 14-CR-74 CJW-MAR<br><br>**MEMORANDUM OPINION AND ORDER** |

## I. INTRODUCTION

This matter is before the Court on defendant's Amended Motion for Compassionate Release filed on June 30, 2020. (Docs. 101 & 102). On July 7, 2020, the government timely filed a brief in resistance. (Doc. 103). On July 9, 2020, defendant timely filed a reply. (Doc. 104). Oral argument was not requested and is not necessary. *See* LR 7(c). For the following reasons, the Court **denies** defendant's motion.

## II. RELEVANT BACKGROUND

On May 14, 2014, defendant and C.H. purchased items at a Target in Cedar Rapids, Iowa to manufacture methamphetamine. (Doc. 49, at 3). On May 15, 2014, at around 6:00 a.m., defendant and C.H. attempted to manufacture methamphetamine in the kitchen of defendant's apartment using the "one pot" method. (*Id.*). Defendant's girlfriend and roommate D.C., who was asleep in her bedroom, awoke to defendant and C.H. yelling about a fire. (*Id.*). D.C. exited the bedroom and saw that the kitchen sink was "engulfed in flames." (*Id.*). D.C. was forced to abandon her cats in the apartment due to the smoke. (*Id.*). The entire apartment building was evacuated. (*Id.*, at 4). C.H. fled the scene after exiting the building. (*Id.*). Officers spoke with defendant and noticed

he had singed facial hair and burn marks on his face. (*Id.*). Upon searching defendant's person, officers discovered a digital scale, a small container of methamphetamine, and a list of items used to manufacture methamphetamine. (*Id.*). Defendant admitted to attempting to manufacture methamphetamine in the apartment. (*Id.*). Pseudoephedrine logs later revealed defendant had purchased 164.36 grams of pseudoephedrine from February 2012 to May 2014 across two different driver's licenses. (*Id.*).

On July 22, 2014, a grand jury issued an Indictment charging both defendant and C.H. with conspiracy to manufacture methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846 and attempting to manufacture methamphetamine in violation of the same sections as well as Title 18, United States Code, Section 2(a) ("Count 2"). (Doc. 3). That same day, defendant pleaded not guilty and was detained. (Doc. 8). On September 8, 2014, defendant changed his plea to guilty on Count 2 pursuant to a plea agreement with the government. (Docs. 36 & 38). On September 23, 2014, the Court accepted defendant's plea. (Doc. 42).

On November 17, 2014, the United States Probation Office filed defendant's final presentence investigation report ("PSR"). (Doc. 49). Defendant was, at that time, 33 years old. (*Id.*, at 2). Defendant never met his biological father and his biological mother abused alcohol and was often unemployed. (*Id.*, at 13). Defendant switched back and forth between foster care and his mother's residence until he was adopted at age three or four. (*Id.*). Defendant's adoptive parents separated when he was ten, at which point he resided with his father. (*Id.*). Defendant had a close relationship with his father. (*Id.*). Defendant dropped out of high school but later earned his GED. (*Id.*, at 16). He had one child from a prior relationship whom he supported. (*Id.*, at 13). Defendant's criminal convictions at the time of sentencing were relatively minor, consisting of drinking underage, theft by taking, disorderly conduct twice, malicious injury to personal property, and possession of drug paraphernalia twice. (*Id.*, at 6–7).

From January 2002 to May 2010, defendant served in the military. (*Id.*, at 16). Despite being injured during his first tour of combat in Iraq from 2005 to 2006, he returned to combat in 2007 before ultimately finding his injuries hindered his service. (*Id.*). Although he offered to continue serving in combat because he felt military life in Iraq was safer and easier than civilian life in the United States, his request was denied. (*Id.*). Defendant received a litany of commendations for his service and continued to serve as a hand-to-hand combat instructor until his medical discharge in 2010 with the rank of corporal. (*Id.*, at 16–17). Following his service, he collected disability and retirement benefits. (*Id.*, at 17).

Defendant reported that he underwent nine surgeries since 2002 to repair a hernia which damaged his nerves and caused him constant pain. (*Id.*, at 14). He also reported that he needed surgery to repair ligaments in his neck. (*Id.*). Defendant injured his clavicle while in combat which was later aggravated by a car accident in 2013. (*Id.*). Defendant also suffered a traumatic brain injury due to a roadside bomb in Iraq which continued to give him headaches, various pains, and short-term memory loss. (*Id.*). Defendant's records from the Department of Veterans Affairs ("VA") showed he was also involved in a Humvee accident in Iraq which gave him a concussion and minimal amnesia. (*Id.*). In the past, he had been treated for chronic obstructive pulmonary disease ("COPD") and chronic pain. (*Id.*). Defendant was treated for severe posttraumatic stress disorder ("PTSD"), anxiety, depression, repeated nightmares, and anger disorder. (*Id.*). Defendant's PTSD stemmed from witnessing the death of a fellow soldier, witnessing a "mass casualty incident," and the violent deaths of three of his foster brothers, one of which he witnessed. (*Id.*, at 14–15).[1]

---

[1] One of his foster brothers was murdered in 2001 during a drug-related incident, another was "decapitated in a Corvet[te]" in 2006, and another was shot to death in front of defendant in 2007. (Doc. 49, at 14–15).

3

Defendant reported normal use of alcohol, but VA records showed concern about his frequent intoxication. (*Id.*, at 15). Defendant began using marijuana in his late teens, stopped using while he was in the military, and then began using daily thereafter. (*Id.*). Defendant used methamphetamine three or four times a week for the last two or three years. (*Id.*). He used cocaine multiple times a week for several years. (*Id.*). He was addicted to pain medications for a brief period following a surgery. (*Id.*). Defendant reported that he used methamphetamine and cocaine to stay awake and thereby avoid his constant nightmares. (*Id.*). In 2007, he completed substance abuse treatment. (*Id.*). In 2012, he was found unresponsive due to overdosing on methamphetamine and Xanax. (*Id.*). Defendant denied that this was a suicide attempt but stated that it would not have mattered if he died because "at least he would no longer be in pain." (*Id.*). He successfully completed drug treatment again that same year. (*Id.*). In 2013, defendant was again found unresponsive due to overdosing on benzodiazepines, marijuana, and methamphetamine. (*Id.*, at 16).

On December 29, 2014, the Court sentenced defendant. (Doc. 67). Defendant, with four criminal history points, was in criminal history category III and had a total offense level of 30, yielding an advisory guideline range of imprisonment of 121 to 151 months followed by three years on supervised release. (*Id.*). Defendant moved for a downward departure because of his military service and a downward variance based on his military service, mental health, and addiction issues. (Doc. 54). The Court granted defendant's motion for a downward departure because of defendant's military service and sentenced him to 101 months' imprisonment followed by three years on supervised release. (Docs. 67; 73; 75, at 2; 84, at 7). On January 13, 2015, defendant timely appealed his sentence. (Doc. 76). On February 25, 2015, the Eighth Circuit Court of Appeals granted defendant's motion to voluntarily dismiss his appeal. (Doc. 88).

Defendant is now incarcerated at FCI Danbury with a projected release date of September 21, 2021. (Doc. 102, at 2).

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the United States Sentencing Guidelines ("USSG") section discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the

5

defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

### IV. DISCUSSION

#### A. *Exhaustion of Administrative Remedies*

Section 3582(c)(1)(A) states a court may reduce a term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" This Court has held that defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of

6

Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion in the courts. *See Burnside*, 2020 WL 3443944, at *4–7.

On May 15, 2020, defendant submitted a request for release to FCI Danbury's warden. (Doc. 102–1, at 2–3). On June 2, 2020, the warden denied his request. (Doc. 102–2). On June 8, 2020, defendant filed a pro se motion for release with the Court. (Doc. 96). After the Court appointed defendant counsel (Doc. 97), defendant filed his motion for release now before the Court (Doc. 101). Because 30 days elapsed since defendant's request was submitted to the warden, the Court finds defendant has fulfilled the exhaustion requirement of Section 3582(c)(1)(A).[2]

### B. *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his medical conditions put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 102, at 7–13). Defendant cites his COPD, asthma, chronic pain, PTSD, and depression. (*Id.*). The government argues defendant's health conditions are well-controlled and do not warrant release. (Doc. 103–1, at 10–18).

The presence of COVID-19 at a defendant's specific facility or within the BOP generally can constitute an extraordinary and compelling reason for compassionate release if the defendant is particularly susceptible to COVID-19 due to their age or underlying health conditions. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases); *see also see also People Who are at Increased Risk for Severe Illness*, CDC, https://www-.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html.

---

[2] Defendant candidly notes that his request to the warden only cited his COPD and asthma; it did not discuss his PTSD, chronic pain, or depression as his motion does here. (Doc. 102, at 2, 6). The government acknowledges this discrepancy but does not argue defendant has failed to exhaust administrative remedies on these conditions such that the Court should not consider them. (Doc. 103–1 at 10, 15). In light of the government's lack of resistance, the Court will consider all of defendant's health issues raised here.

7

Defendant has both a chronic lung disease, namely COPD, and moderate asthma. (Doc. 102–3, at 2). He was first diagnosed with asthma in 2002 and COPD in 2006. (*Id.*, at 37). Defendant reported that he developed respiratory issues after being exposed to smoke, fiber, and other "toxic air-borne substances" while in Iraq. (*Id.*, at 37, 42). Defendant is prescribed an inhaler not for regular use but instead only to prevent or relieve an asthma attack, used via two puffs four times a day as needed. (*Id.*, at 67). It appears his air flow was only recorded on one occasion, August 15, 2019, at which time he measured 440, 440, and 450 without a bronchodilator. (*Id.*, at 38). Given his height of 5' 5'' or 5' 6'' and age of 39, his air flow should be closer to the 610 to 488 range.[3] Although these measurements are significantly low, they are nearly a year old and the Court has no other tests which indicate a pattern of poor breathing. Defendant's respiratory system was twice described as "[w]ithin [n]ormal [l]imits" in May 2020. (*Id.*, at 9, 14). His lungs are recorded as sounding "[c]lear" three times in 2020. (*Id.*, at 10, 12, 22). His only two respiratory rate measurements on record, both from 2019, registered 14 breaths per minute, which is within normal range. (*Id.*, at 72).[4]

---

[3] Normal flow rate varies based on height, age, and sex. *Peak Flow Meter*, American Academy of Allergy, Asthma, & Immunology, https://www.aaaai.org/conditions-and-treatments/library-/asthma-library/peak-flow-meter. Defendant's peak air flow should be around 610 based on a chart published by the University of Edinburgh. *What is Normal Peak Flow?*, My Lungs My Life,-https://mylungsmylife.org/topics/group-1/peak-flow/what-is-a-normal-peak-flow-2/.
Thus, defendant's breathing rate is relatively normal when between 610 and 488, concerning when between 488 and 305, and cause for emergency when below 305. *Peak Flow Meter*, AAAAI (describing the "Traffic Light System" used in the field).

[4] "Normal respiration rates for an adult person at rest range from 12 to 16 breaths per minute." *Vital Signs (Body Temperature, Pulse Rate, Respiration Rate, Blood Pressure)*, John Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/vital-signs-body-temperature-pulse-rate-respiration-rate-blood-pressure#:~:text=Respiration%20rates%20may-%20increase%20with,to%2016%20breaths%20per%20minute.

Defendant experiences chronic pain, particularly in his groin. *See, e.g.*, (*Id.*, at 22, 29, 37) (noting pelvic and inguinal pain). He receives medication for his pain, at least one of which has gradually increased up to the maximum dosage, which he described as helpful. (*Id.*, at 22, 28, 32, 67). Although defendant's VA records show he described his pain as 9/10 in 2014 (Doc. 102–8, at 126), his more recent records at the BOP do not contain any alarming pain assessments. BOP records note, however, that defendant has a two implanted transcutaneous electrical nerve stimulator ("TENS") units to help manage his chronic pain. (Doc. 102–3, at 37, 68). A TENS unit "sends electrical pulses through the skin to start [the] body's pain killers [and] stop pain signals in the brain." *Transcutaneous Electrical Nerve Stimulator (TENS)*, University of Iowa Hospitals and Clinics,-https://uihc.org/health-topics/transcutaneous-electrical-nerve-stimulator-tens. Although his chronic pain is not discussed in detail and defendant has not reported any pain recently, his condition is still listed as current and receiving medication. (*Id.*, at 22, 24, 68).

Defendant's mental health concerns are significant. He continues to suffer from PTSD, anxiety, and depression, for which he receives medication. (Doc. 102–3, at 32, 37). These conditions impair his mood and sleep and give him flashbacks. (*Id.*, at 32). In September 2019, defendant requested his medication be changed because he was still "waking up with terrifying nightmares." (*Id.*). His VA records provide more context about defendant's traumatic experiences in Iraq. Defendant's PTSD primarily stems from an incident in which "he had to kill a 7 year old boy who had explosives strapped to his chest" and another incident in which "a bomb hit a Humvee, killing 27 civilian kids, 70 adults, and one of his soldiers." (Doc. 102–8, at 127). In the latter incident, defendant "described that human parts were being thrown at him while he was trying to attend to the survivors and put out the fire in the HUMVEE." (*Id.*). As a result of these incidents and others, defendant had "repeated nightmares" which were so bad he was getting two

9

hours of sleep a night in 2014. (*Id.*, at 49, 127). Defendant reported to the BOP that he abused alcohol and drugs to "block out the screams at night." (Doc. 102–3, at 33). The VA found defendant was 90 percent disabled, 50 percent of which was attributable to his PTSD. (*Id.*, at 125).

In sum, defendant has only moderate COPD and asthma, significant chronic pain which appears to be well-controlled, and substantial mental health concerns which still cause ongoing issues, particularly with his sleep. In *United States v. McCauley*, this Court held that "COPD is itself a high-risk factor during the pandemic." No. 14-CR-94-CJW-MAR, 2020 WL 3513701, at *6 (N.D. Iowa June 29, 2020). The CDC agrees. *People of Any Age with Underlying Medical Conditions*, CDC, https://www.cdc.gov/-coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Although the defendant in *McCauley* had only moderate COPD and asthma, the Court found such conditions were compounded by his preexisting sleep apnea and severe chronic pain, even though the latter did not inherently raise his susceptibility to COVID-19. 2020 WL 3513701, at *5–6. The Court ultimately concluded the defendant presented an extraordinary and compelling reason for release by a slim margin. *Id.*, at *6.

This case presents a similar situation to *McCauley*, although defendant's chronic pain is far less severe. *See id.*, at *5–6 (crediting the sheer severity and persistence of the defendant's "excruciating" and "unbearable" chronic pain). Instead, defendant's COPD and asthma here are more significantly compounded by his PTSD. In *United States v. Kantaris*, this Court acknowledged "that mental health concerns may compound a defendant's physical ailments, [but that] mental health alone is not the type of condition which itself increases an inmate's susceptibility to COVID-19." No. 16-CR-3024-CJW-MAR, 2020 WL 3513702, at *4 (N.D. Iowa June 29, 2020). In *United States v. Johnson*, the District Court for D.C. granted release to a defendant with pulmonary hypertension, obesity, and PTSD from serving two combat tours in Afghanistan, stating:

> But there is even more at stake with respect to the risks to [the defendant's] health. The Sentencing Commission's policy statement also plainly indicates that a defendant's mental health needs may also be the basis for granting compassionate release, and this Court further finds that [the defendant's] diagnosed PTSD makes his release request especially compelling. To be sure, any inmate who is at a higher risk of serious illness or other complications from COVID-19 faces challenges in caring for himself in prison when it comes to protecting from this coronavirus or exercising self-care if he contracts COVID-19. But one can only imagine that the challenges of self-care inside a prison where COVID-19 is raging would be especially severe for someone who suffers from PTSD in addition to his physical vulnerabilities. *Cf. Doe v. Barr*, No. 20-cv-02141, 2020 WL 1820667, at *4, *9 (N.D. Cal. Apr. 12, 2020) (ordering the release of a foreign national, detained in a county jail awaiting for his removal proceedings, in part because he suffers from PTSD and "[g]rowing evidence demonstrates that PTSD, anxiety/stress, and depression can lead to decreased immune response and increased risk of infections" and thus "compound his susceptibility" to COVID-19).

No. 15-cr-125 (KBJ), 2020 WL 3041923, at *8 (D.C.D. May 16, 2020); *see also United States v. Pina*, No. 18-cr-179 (JSR), 2020 WL 3545514, at *1–2 (S.D.N.Y. June 29, 2020) (granting release to a defendant with PTSD, depression, insomnia, nightmares, and flashbacks after witnessing the murder of his father as a child, noting that the pandemic "exacerbates" mental health problems); *United States v. Lavy*, No. 17-20033-JAR, 2020 WL 3218110, at *5 (D. Kan. June 15, 2020) ("Defendant's age, hypertension, and mental health issues . . . satisfy the Court that Defendant faces a heightened risk of serious illness or death if infected with COVID-19."); (Doc. 102–9) (discussing the effect of COVID-19 on mentally-ill inmates).

Courts are, however, rightly skeptical of allowing mental health conditions to play a dominant role in a defendant's motion for compassionate release because such conditions do not inherently increase a defendant's susceptibility to COVID-19. *See, e.g.*, *United States v. James*, No. 15-cr-00255 (SRN), 2020 WL 3567835, at *4 (July 1,

11

2020) (holding that mental health disorders, among other things, are not known to increase a person's susceptibility to COVID-19); *United States v. Sam*, No. 17-83, 2020 WL 3415771, at *3 (E.D. La. June 22, 2020) (holding the defendant's PTSD, although difficult, was not a serious and advanced illness within the meaning of the policy statement); *United States v. Polnitz*, No. 17-cr-201-pp, 2020 U.S. Dist. LEXIS 105961 (E.D. Wis. June 12, 2020) (denying release based on mental health issues, moderate obesity, and asthma). Thus, although mental health concerns are validly raised and considered in a motion for compassionate release, courts must carefully assess the ramifications of a defendant's mental health on their physical health, the extent to which COVID-19 would exacerbate such ramifications, and the mental health resources available to the defendant in the BOP.

This is a close case, but the Court finds defendant has not presented an extraordinary and compelling reason for release. He is only 39 years old. (Doc. 49, at 2). Defendant's only two conditions which raise his susceptibility to COVID-19, COPD and asthma, are moderate and well-controlled. His chronic pain, which itself is not directly relevant to COVID-19, is also well-controlled. Although the Court is sympathetic to defendant's struggles with PTSD and depression, his substantial mental health needs are also well met at FCI Danbury. In his brief, defendant notes he was transferred to FCI Danbury because it "has the only PTSD treatment program for men within the BOP." (Doc. 102, at 13). He was transferred to FCI Danbury less than a year ago. *See* (Doc. 102–5) (noting his last disciplinary violation was on August 29, 2019, and occurred before his arrival at FCI Danbury). Defendant notes that he has "benefitted" from the program and intends to enroll in a "similar program" if released. (Doc. 102, at 13). Moreover, his May 26, 2020 progress report states he is still participating in the Non-Residential Drug Abuse Treatment Program. (*Id.*, at 3). Defendant has also had sufficient access to medication, therapy, and mental health

assessments at FCI Danbury and throughout his time in the BOP. *See, e.g.*, (Doc. 102–3, at 10, 12, 33). Although his PTSD is undoubtedly serious, it is well-address by the BOP, as are his other medical conditions. The Court is not persuaded that defendant should be released early from a structured environment that is meeting his physical and mental health needs, and potentially before completion of his treatment program, merely so that he can attempt to recreate a similar care environment elsewhere with less structure. Moreover, FCI Danbury currently has no active cases of COVID-19, although one inmate has died and a significant number of inmates and staff persons have recovered. *COVID-19*, BOP, https://www.bop.gov/-coronavirus/; *see also Johnson*, 2020 WL 3041923, at *8 (noting mental health is particularly relevant when inmates are in a facility where COVID-19 is "raging"). In short, defendant is at only a marginally elevated risk of complications from COVID-19, his physical and mental health needs are well-addressed, and he is at a low risk of exposure at this time.

Thus, the Court finds defendant has not presented an extraordinary and compelling reason for release. In the alternative, the Court will examine the 3553(a) factors independently as if defendant had presented an extraordinary and compelling reason.

### C. *Section 3553(a) Factors and Danger to Community*

Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the

13

USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

Defendant's underlying offense is serious. His attempt to manufacture methamphetamine caused $22,811.96 worth of fire damage to the apartment building. (Doc. 49-1). Importantly, because the fire occurred early in the morning in a crowded building likely filled with many sleeping occupants, defendant's conduct could have easily resulted in far worse than property damage. Further, defendant purchased a substantial amount of pseudoephedrine over the last two years by switching between two different driver's licenses.

At the time of sentencing, defendant's criminal history was relatively minor with his most recent convictions being low-level drug paraphernalia offenses. He had spent at most a month in jail if any significant time at all. (Doc. 49, at 6–7). Defendant was only placed on probation once and was successfully discharged with only one minor violation. (*Id.*, at 6). The government notes that since the time of sentencing, however, defendant has pleaded guilty to many of the pending charges listed in his PSR. (Doc. 103-1, at 19); *see also* (Docs. 103-3, 103-4, 103-5, 103-7, 103-9, & 103-10). In June 2012, defendant was transported to a hospital after he was apparently found in a car in the middle of the road with a makeshift one-hitter pipe and a syringe containing methamphetamine. (Doc. 49, at 8). In February 2013, defendant was involved in a single-car accident. (*Id.*, at 9). Lithium batteries, a fuel cannister, coffee filters containing methamphetamine, and a "one pot" methamphetamine lab were found in his vehicle. (*Id.*). In May 2013, officers pulled defendant over after receiving a report that he was driving "all over the road." (*Id.*). Officers recovered a marijuana grinder, prescription amphetamine, and a 12-gauge shotgun from his vehicle. (*Id.*). In June 2013, defendant, while intoxicated, drove his vehicle off the road. (*Id.*, at 10). A

methamphetamine lab was found in the vehicle. (*Id.*). In November 2013, defendant was found to be in possession of marijuana, a marijuana pipe, and alprazolam. (*Id.*, at 11). In March 2014, defendant used a credit card without authorization. (*Id.*). Thus, in the two years prior to the instant offense, defendant was charged with and ultimately convicted of possession of methamphetamine twice, possession of a prescription drug, operating while intoxicated, possession of drug paraphernalia, and unauthorized use of a credit card for less than $1,000. (Docs. 103–3, 103–4, 103–5, 103–7, 103–9, & 103–10). These convictions show defendant's addiction and criminal conduct went undeterred over the course of years despite the repeated intervention of law enforcement officers.

Defendant's addiction, undoubtedly, is deeply rooted in the pain and suffering he endured while serving his country, in addition to the trauma he suffered as a child. The Court at sentencing, however, took defendant's military service into account when it departed downward. While incarcerated, defendant has worked and taken some educational courses. (Doc. 102–5). He has been disciplined several times, however, for fighting with another inmate, refusing a work assignment twice, refusing to obey an order three times, and, most recently and most notably, use of drugs, i.e. buprenorphine, in August 2019 while in a holdover facility. (Doc. 102–6). His relapse strongly suggests he needs further treatment and is not yet ready for release.

Defendant has a promising release plan (Doc. 102–7), he has completed most of his sentence (Doc. 102, at 13), and there are many mitigating facts in his background. The Court cannot, however, ignore defendant's addiction-fueled recidivism and his related disciplinary violations while incarcerated. Defendant is not only in need of further deterrence but further treatment. FCI Danbury offers both these things to defendant. *See* (Doc. 102–5) ("[S]ince his arrival at FCI Danbury and placement in the Veteran's Unit, [defendant] has maintained his sobriety and is working to better himself for a successful re-entry into society."). Although defendant has sacrificed greatly for his country and

has a promising future, that future would be jeopardized, and the public would be at greater risk, if the Court were to prematurely release him only to have him return to a life of drug use and criminal conduct.

On balance, the circumstances here weigh in favor of maintaining defendant's sentence in order to fulfill the goals of Section 3553(a).

## V. CONCLUSION

For these reasons, defendant's Amended Motion for Compassionate Release (Doc. 101) is **denied**.[5]  Defendant must serve the remainder of his term of incarceration as previously directed.  (Doc. 73).

**IT IS SO ORDERED** this 21st day of July, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

---

[5] To the extent defendant's pro se motion for compassionate release (Doc. 96) is not superseded by his amended motion here, the Court **denies** it as duplicative.